[*General Term, April,* 1873.]

## THE CINCINNATI, HAMILTON AND DAYTON RAILROAD COMPANY *v.* CONRAD AHR AND WIFE.

" Where two parcels of land, belonging to different owners, lie adjacent to each other, and one parcel lies lower than the other, the lower one owes a *servitude* to the upper, to receive the water which *naturally* runs from it, provided the industry of man has not been used *to create the servitude,*" and this applies to parcels of land in cities and towns as well as to such parcels in the country.

" The erection of an embankment upon one's own land, whereby the surface water of the adjoining land of another is prevented from flowing in its natural course, and caused to flow off in a different direction over the land of the latter, is a nuisance, for which an action may be maintained and a recovery had."

Where a strip of ground in a suburban village lies opposite to the premises of A., from which premises, without artificial means, the water naturally flows over said strip and over a railroad track laid along the same, and the railroad company owning said strip had been accustomed to receive stone for shipment on its cars, which stone was first deposited on said strip, between said track and the premises of A., and the *debris* from said stone had gradually formed an embankment, which caused the surface water coming from the land of A., to be turned back thereon, to the damage of A.: *Held,* that A. could maintain an action against the railroad company for a nuisance, and recover for the damage so sustained.

THIS is a petition in error to reverse a judgment rendered at Special Term.

*Matthews, Ramsey & Matthews,* for plaintiff in error.

*J. R. Challen,* for defendant in error.

O'CONNOR, J.   The defendants in error, plaintiffs below, allege in their petition that Elizabeth Ahr, wife of Conrad Ahr, is the owner in fee simple of a certain lot of ground and a dwelling-house thereon, situated on State and

L'Hommedieu streets, in A. H. Ernst's subdivision of Spring Garden, Hamilton county, Ohio; and that the plaintiffs in error, defendants below, having a railway extending along said L'Hommedieu street, in front of and near to the said residence of the defendants in error, have for some years been in the constant habit of unloading stone, for the purpose of transportation, on their said railway, thereby causing an embankment from the dirt from said stone to be formed on the railway opposite and near to said dwelling, in consequence of which, water, which otherwise would flow away without causing injury to said dwelling and premises, is caused to flow back into said premises, and into the cellar thereof, rendering the said premises uncomfortable and inconvenient, and causing damage, etc.

The plaintiffs in error, in their original answer, do not deny the facts stated in the petition, nor any of them; but say that the land described in the petition, together with the land upon which said L'Hommedieu street and the right of way of the railroad company now are, formerly belonged to Andrew H. Ernst; that in 1850, before the conveyance to the defendants in error of their land, mentioned in the petition, said Ernst and wife, then being owners of all of said property, conveyed to the plaintiffs in error, together with other land, the use of that portion of L'Hommedieu street, opposite the premises of the defendants in error, and along which said railway is constructed and operated, and that it was understood between said Ernst and the railroad company that so much of said strip, it being eighty feet wide, as might not be needed for the railroad tracks, was thereby appropriated for a public street and to be used as such on both sides of said track, but not so as at any time to conflict with the proper and necessary uses and privileges of said railroad; that immediately thereafter the railroad company took possession of said strip of land for a right of way, and constructed, and up to the present time has maintained, its railroad on the same,

and that it has ever since been in the continuous, uninterrupted, notorious and lawful possession of said strip of land, and that the defendants in error purchased their property subject to the rights of the plaintiffs in error, and with full knowledge thereof; and that said acts complained of were performed by the railroad company in operating its road, and were part of and in pursuance of the necessary uses and privileges of said railroad, and that they are not liable for the damage to the property of the defendants in error.

This answer, it will be seen, is a full justification of the acts complained of in the petition, and an admission that the facts stated in the petition are true.

The plaintiffs in error, however, filed an amended answer, or rather an amendment to the answer, as they call it, which is as follows: "The defendant, by way of amendment to its answer herein filed, says that it denies the allegations of the petition touching the placing of obstructions in the street, and causing water to flow upon plaintiff's premises, and they deny that plaintiffs suffered any damage by reason of such acts."

To these answers the plaintiffs reply:

" 1. That it is not true that the defendant has been in continuous, uninterrupted, and lawful possession of said land described in the answer, from the date of said supposed deed of conveyance from the alleged date thereof, to the time of commencing this action.

"2. That the strip of land upon which the railroad company made obstructions was part of the public highway, and over which the plaintiffs had the right of way equally with the railroad company, and that the obstructions were placed there unjustly and illegally by the defendants, and caused the damages set forth in the petition.

" 3. The plaintiffs deny that the defendants acquired the right by the said supposed deed, as pleaded in the petition, or otherwise, of obstructing the natural flow of water from the higher lands above the plaintiffs' property, described in

the petition, so as to cause said water to flow back on to the plaintiffs' premises, and cause the plaintiffs loss, inconvenience, and damage, as set forth in the petition."

On these pleadings the case was tried to a jury. There was no material conflict in the testimony, the witnesses on both sides agreeing substantially as to the facts. The evidence showed that the general lay of the land, including the land above, and to the rear of plaintiff's lot, as well as the plaintiff's lot and the strip of land occupied by the railroad tracks, is hill-side, sloping toward Mill creek, and that water would naturally drain to the creek; running off the lot of plaintiff, and over the railroad track to the creek, or over the track in part and into a sewer, which the company has built between the railroad tracks, and which carries water to Mill creek. That for a number of years, stone intended for transportation over the company's road, or stone bought by the company, to be delivered on the cars, has been deposited by the haulers of the stone on the side of the track near to and opposite the plaintiffs' premises, and the company claim, although this is a question of law rather than of fact, that it has no control over the haulers of the stone, and that such haulers are not their agents or servants. That the refuse and *debris* of this stone, left after the stone has been removed to the defendants' cars, has gradually accumulated until an embankment has been formed on the side of the track, and that this embankment, although not more than eighteen or twenty inches high, prevents the water, which, in wet weather, drains from the lots lying higher up the slope than the plaintiff's lot, and the water which drains down the Walker Mill road and runs across in front of plaintiff's lot, as well as the water which *naturally* drains from the plaintiff's own lot, from flowing across defendants' tracks, or into the sewer between the tracks, and causes all such water to flow back on to and over plaintiff's premises, sometimes filling his cellar, keeping the grounds in front of his house wet and muddy, and rendering his house uncomfortable and unhealthy. It was

also in . evidence that plaintiffs built their house‑about seventeen years before the suit was brought, and that the railroad company owns all the other lots in the vicinity except the plaintiffs', and that the nuisance complained of has continued for more than four years, and that plaint‑ iffs had often complained to the section boss of the rail‑ .road company about it.    It was also in evidence, that before the railroad was built, there was a continuous slope from the rear of plaintiff's premises to Mill creek.    And the de‑ fendant also offered in evidence the deed from Ernst, men‑ tioned in the answer.

The testimony being closed, the plaintiff's counsel asked the court to charge the jury :

"1. That it is an established principle, that where two parcels of land, belonging to different owners, lie adjacent to each other, and one parcel lies lower than the other, the lower one owes a servitude to the upper, to receive the water which naturally runs from it.    The owner of the upper piece of land has a natural easement in the lower piece, to the extent of the natural flow of water from the upper piece, to and upon the lower one."

This charge the court gave as requested, and the defend‑ ant excepted, and assigns the same for error.

The charge is material, and if not the law in this case, is undoubtedly prejudicial to the plaintiff in error.    We find, however, that the charge as requested and given, is copied word for word from the decision of the Supreme Court in the case of *Butler* v. *Peck*, 16 Ohio St. 342, and · that that case was decided upon the general principle con‑ tained in the charge given.    The syllabus sufficiently shows the nature of the case.    It is as follows :

"Where, upon the lands of B., there is a marshy basin, from which, in times of high water, a portion of the water contained in the basin overflows its rim, and naturally finds its way through a swale to and upon the lands of E., while the remaining portion of the water of the basin has no outlet, and is dissipated by evaporation, B. can not

rightfully, by an artificial drain, conduct the water that has no natural outlet from the basin, and along said swale, so as to cause them to flow upon the lands of E. to his damage."

The Supreme Court says, to sanction this, "would be to sanction the creation, by artificial means, of a servitude which nature has denied. The natural easement arises out of the relative altitudes of adjacent surfaces as nature made them, and these altitudes may not be artificially changed to the damage of an adjacent proprietor."

Counsel for the plaintiffs also asked the court to charge the jury:

"That the erection of an embankment upon one's own land, whereby the surface water of the adjoining land of another is prevented from flowing in its natural course, and caused to flow off in a different direction, over the land of the other, is a nuisance, for which an action may be maintained, without showing any actual damage, and for which nominal damages at least may be recovered."

This charge the court gave as requested, to which the defendants excepted, and assign the same for error.

This charge, also, we find to be, word for word, the syllabus of our Supreme Court in the case of *Tootle* v. *Clifton*, 22 Ohio St. 247, and was the principle on which that case was decided. The court say: "Every act of preventing the water flowing from another's land in its natural channels, and causing it to flow over his land, without his consent, is an invasion of his rights, and therefore actionable. . . . The act of flooding my neighbor's farm, by penning up the waters on its surface, is wrongful *per se*, and in its inception, and not wrongful merely because it affects him in a particular manner, or to a certain extent." We must say, therefore, *a fortiori*, that such an act is wrongful, where actual damages have resulted.

It is claimed, however, although the general principle is as stated in the two cases above cited, yet that the doctrine of servitude for surface drainage does not apply to cities and towns at all. And in support of this view, Washburn

on Easements, 357, is cited, where the author says: "But it would seem that this doctrine of a lower estate owing servitude to a superior one, to receive the water that falls upon the latter, and would naturally flow therefrom to the former, does not apply to house-lots in towns and cities, where the same have been occupied by the erection of houses thereon. In such cases each proprietor must, if the same can be done, so grade his lot as not to throw the water which collects on the same upon the adjacent lot." And cites *Bentz* v. *Armstrong*, 8 Watts & Sergeant, 40. The syllabus of that case is: "Where several persons unite in the purchase of a piece of ground, and divide the same into smaller lots, upon each of which a house is built, and then partition is made between them, each must so regulate and grade his own lot as that the water which falls or accumulates upon it shall not run upon the lot of his neighbor." The facts of the case were, that Bentz and Armstrong were the owners of adjoining lots in the city of Pittsburg, Pennsylvania. There was a spring of water upon one of them, which, together with the rain, as it fell, naturally flowed from it upon the other lot, and the owner of the latter, in order to prevent this, raised an embankment upon his land, which caused this water to set back into the cellar upon the lot in which it originated. The court held that he had a right so to do, and that it was the duty of the owner of the upper lot to drain the same into the common sewer, if there was one, or in some other way, if possible, to relieve the adjacent house-lot. The court say, in deciding the case: "In the argument something was said about the natural formation of the surface of the ground of the two lots, and that, according to it, the water as it fell in rain was naturally inclined to run off from the lot of the plaintiff on to that of the defendant, and the latter was therefore bound to submit to it. This, however," says the judge deciding the case, "I take to be a *non sequitur;* for, in the purchase of lots of ground, laid out and sold for the purpose of building up towns or cities thereon,

it has ever been understood, and such has been the practice and usage too, that the natural formation of the surface will, and indeed must, necessarily, undergo a change in the construction of the buildings and other improvements that are designed and intended to be made. In doing this, it it would seem to be right that the common benefit and convenience of the respective owners of adjoining lots should be consulted and attended to; but certainly no one ought to be restrained from improving his lot in such a manner as to make it answer the purpose for which it was laid out, sold, and purchased, if practicable, without overreaching upon his neighbor's lot. . . . It is of great importance that the water upon each lot, arising from rain or other cause, should be conducted by the owner or occupier thereof, if he wishes to have it removed, directly from it to a sewer or other place appropriated for the receipt and discharge of the same, and not be turned or led on to an adjoining lot, without the consent of the owner; and it appears to me," continues the judge, "to be the duty of the owner of each lot, if he improves it, to do it in such way, if practicable, as to lead and conduct the water that happens to fall or be on it, off in the way just mentioned, without regard to the original formation of the surface of his lot. If the rear of his lot should be elevated so much above the front, that he can not conduct the water to the rear, so as to discharge it into a sewer or other appropriate place, then he ought to bring it to the front of his lot, where he must of necessity have some place to discharge it, without throwing it upon his neighbor's ground. This he ought to do, even if he should be compelled to carry it under or through his house or buildings." There certainly is great force in these remarks of the judge who decided the case, and as one member of this court, I am inclined to believe that the law ought to be, in towns and cities, as it was there decided. But it is to be remarked that this is the *only* case cited by Washburn in support of his suggestion that the law of servitude does not apply to the surface-

water of house-lots in towns and cities, where the same have been occupied by the erection of houses thereon. And the only other case which he cites, where the question arose within a town or city, is decided the other way. That is the case of *Earl* v. *De Hart*, 1 Beasley's Chancery, 280; "where the land lay in Elizabeth city, New Jersey, and the waters that were accustomed to collect upon its surface from rains, etc., were accustomed to flow over the defendant's land by an ancient water-course, it was held that, though within a city, he had no right to stop such watercourse." The court says: "It is insisted that the law, as to running water, does not apply to building-lots in a city or large town. I can not see why it does not. Here is a body of water which must be discharged, either over the building-lot of the complainant or over the building-lot of the defendants. It is true it is injurious to the lot of the defendants to have it discharged over it, but then it is the right which the neighboring lot enjoys to have it so discharged. There is a right and an obligation, as between the two lots, which have been acquired and imposed by prescription. The complainant's is the dominant, to which the right belongs, and the defendant's the servient, upon which the obligation rests. To have this water discharged upon the complainant's land, is as great an injury to her building-lot as it is to the defendant's lot to have it discharged there. There can be no such difference in the application of the law, as to building-lots, as will impose a burden upon one which properly and of right belongs to another."

These two are the only cases cited by Washburn where the subject of litigation arose in a city or town, and although the latter of the two arose out of the diversion of what is called a *water-course,* as distinguished from mere surface-water, yet the cases seem to offset each other in the general principles announced. It may be said that if the doctrine of servitude as to surface-water does not apply to towns and cities, it is almost incredible that only one case should

be cited in support of the exception from all the reports, both in England and in this country. Beside, as we have seen in 16 Ohio St., and in 22 Ohio St., "the principle seems to be established and indisputable (and the court make no exception), that where two parcels of land, belonging to different owners, lie adjacent to each other, and one parcel lies lower than the other, the lower one owes a *servitude* to the upper, to receive the water which *naturally* runs from it, provided the industry of man has not been used *to create a servitude.*" Although this decision was rendered in a case where the controversy respected country farms, we can not assume that the Supreme Court would announce a principle as a general one, and as being indisputable, which in fact was too broad to be true. Had the court said, " except in cities and towns the principle seems to be established and indisputable," the principle would have been quite broad enough to meet the case before them; but they went much further and announced a principle without any exception or qualification whatever, except that the servitude must not have been created by the industry of man. And this we must hold, under these decisions, to be the law of this state. The same doctrine is found in Washburn on Easements (2d edition), 19, 427, 439; also in *Bear* v. *Murphy*, 37 Vt. 104; and in *Hays* v. *Hinkleman*, 68 Penn. St.; also in *Martin* v. *Riddle*, 26 Penn. 415; and in *Kauffman* v. *Grierson*, 26 Penn. 407.

There was no evidence in the case before us to show that the industry of man changed the natural lay of the ground on which Conrad Ahr's house was built; but the evidence does show that the industry of man prevented the water which would naturally flow from his lot and away from his lot and over the railroad track, from so flowing, and caused it to set back over his premises to his damage.

It should also be remembered that the plaintiffs in this case do not complain merely that the water which falls upon or flows from *their lot* is prevented by the embank-

ment from taking its natural course, but they also complain, and the evidence establishes the fact, that the water which naturally flows down the Walker Mill road, and which would naturally flow over the railroad track or into the sewer between the tracks, is, by this embankment, stopped in front of their house and caused to flow back over their premises; so that even if the law was as it is claimed to be in *Bentz* v. *Armstrong, supra,* and that the law of servitude as to surface-water did not apply to cities or towns (the evidence showing the plaintiff's lot to be a town lot), it would not benefit the defendants except possibly as to the amount of damages; for in no case, either in town or country, can any one be permitted to cause surface-water which does not flow from his neighbor's lot, nor naturally flow upon it, to be *turned* upon it without that neighbor's consent.

As, therefore, the language of the two special charges given by the court and excepted to, is the language of our Supreme Court, in the cases above cited, and as the charges were applicable to this case, we hold they were correctly given.

The defendant then requested the court to charge the jury as follows:

"If the jury find that the deposit of earth in the street was made by persons hauling stone to the railroad, either for sale to defendant, delivered on the cars, or for shipment to other parties, the persons hauling said stone not being servants or agents of defendant, the defendant is not liable for injury occasioned by the deposit of such earth," which the court refused to give as asked, but gave as qualified by the general charge No. 5, to which refusal the defendant excepted, and assigns the same for error.

That part of the general charge of the court, referred to as No. 5, is as follows:

"5. It is next claimed that the defendant never kept a stone-pile, and never caused an embankment to be formed from the same there at all; that such stone was hauled and piled there by other parties to sell to the defendants, which never had any property in such stone until loaded

and measured upon its cars; and also stone which such third parties hauled and piled at the place in question for shipment by the defendants' cars to other third parties along the line of its railroad. I charge you that for the mere acts of third parties, the defendant can not be made liable; but if the ground where such stone-pile and embankment existed—if you find they did exist—was owned by the defendant, it having the right of control over it so as to prevent such use of it by third parties, and if it recognized what they did as proper, and there took the stone from them upon the cars and paid them for it, and received from others, from such stone-pile, stone for carriage for hire upon its cars, and such stone-pile and its *debris* were a nuisance to plaintiffs' said property as they have alleged, then defendant is liable, though it did not actually own the stone while in such pile, but owned and could control the ground where the same existed." We see no error in giving the charge requested by the defendant, as thus qualified. The deed from Ernst set out in the defendant's answer, and offered in evidence by the defendant, was to the effect, and was offered to prove the fact, that the right of the defendant to use the strip of ground opposite plaintiffs' house was superior to the right of the plaintiffs or of the public, the language of the deed being: "It is further understood between said parties, that so much of the eighty feet strip, south of the Harrison turnpike, as may not be needed for the railroad tracks, is hereby appropriated for a public street, and to be used as such, on both sides of the tracks, but not so as at any time to conflict with the proper and necessary uses and privileges of said railroad." And the original answer of the defendant contains the following averment, which is still a part of the record of this case: "That immediately thereafter the railroad company took possession of said strip of land for a right of way, and continued, and up to the present time has maintained its railroad on the same, and that it has ever since been in the continuous, uninterrupted, notorious, and lawful possession

of said strip of land, and that the plaintiffs purchased their property subject to the rights of the defendant, and with full knowledge thereof, *and that said acts complained of were performed by the railroad company in operating its road, and were part of and in pursuance of the necessary uses and privileges of said railroad.*" No doubt the jury considered this, and the introduction of the deed, as strong evidence that the defendant claimed the right to use, and did use, and controlled that part of the strip upon which the stone was deposited and where the embankment was formed, and that the stone was deposited there by their direction. And if so, there can be no doubt the qualification of the charge given by the court was right. It is true the defendant, in what it calls an amendment to the answer, denies that it did the acts complained of, although in the answer itself it admits it did do all of them as charged in the petition, and justifies the acts as being such as it had the right to do; and no doubt the jury, from the evidence, found that its first admission was the truth.

The second charge asked by the defendant is as follows: "That if A. H. Ernst executed and delivered to the defendant the deed offered in evidence, he thereby granted to the railroad company the right to use the eighty-foot street, known as L'Hommedieu street, for railroad purposes; that loading stone, and receiving stone, is a legitimate part of a railroad's business; and that neither Ernst, nor any one claiming by purchase from him, after the date of said deed, can claim damages for injuries resulting from such use, unless the defendant was guilty of some negligence or wrongful conduct in the mode or manner of receiving or shipping said stone."

This charge the court gave as requested, and therefore there is no exception as to it, but it is noticed here for the purpose of showing that in the first charge asked, the defendant assumes that it did not use the eighty-foot strip at all for the depositing of stone, but that the same was used by third persons, not its servants or agents; and that the

second charge asked assumes that it did so use the strip of ground, but that it had the right to do so. In other words, the second charge asked was based upon the admissions of the original answer; and the first charge asked was based upon the denial of the admissions, as contained in the amendment to the answer; and so the court was really asked to charge the jury that the defendant was not liable if it *did not* so use the strip, and that it was not so liable if it *did* so use the strip; therefore that the defendant was not liable at all. This the court refused to do, and, as we have already said, properly.

The defendant next requested the court to give the following charge to the jury: "That the defendant had a right to receive stone in the strip of ground, known as L'Hommedieu street, and that if it did so, from time to time, and removed the same without unreasonable delay, it would not be liable to the plaintiff, although such stone caused the water to run back upon the plaintiffs' lot." This charge the court refused to give as asked, but gave it with this qualification: "Unless the defendant could have conveniently received the stone elsewhere without doing injury to plaintiffs or others." And to the refusal and qualification the defendant excepted, and assigns the same for error.

We see no error in this. In fact, the defendant was not entitled to have the charge considered by the court in any way. It was not claimed on the trial that the water was caused to flow back by the stone, or that there was any negligence on the part of the defendant in not removing the stone promptly. The resistance to the water was caused by the embankment, which was gradually formed by the dirt and *debris* from the stone, and which *debris* would be there left by the mere deposit of the stone, whether the stone was removed immediately or not. The negligence consisted in not removing the *debris*, after the stone was removed, or in not removing the embankment when it had grown so high as to impede the flow of water;

and with the facilities of the company this might have been done, and could now be done, probably, in one hour, were the company so disposed, and this with the aid of only a few workmen, for the embankment is only from eighteen to twenty inches in height. The charge might well, therefore, have been refused altogether by the court; but it can not now be claimed that the qualification of a mere obstruction did any harm.

The fourth charge asked was given.

The fifth charge asked by the defendant is as follows: "That if the jury find that a road or street known as the Walker Mill road, runs across the rear or west side of plaintiffs' premises, effecting a junction with the Harrison pike and L'Hommedieu street, at a corner of plaintiffs' land, and that the water is carried down said Walker Mill road some distance in a gutter or gully, or otherwise, and passing out of the same, runs upon and over the plaintiffs' lot, the defendant is not bound to permit the passage of such water over the surface of its ground." This charge the court refused to give, as asked, but gave qualified as follows: "But if it was aware of such flow, it could not so obstruct it as to cast it upon plaintiffs' ground, if it would not otherwise have flowed upon the plaintiffs' premises, or injured them." And to the refusal and qualification the defendant excepted, and assigns the same for error.

We see no error in the refusal of the charge as asked, and certainly there is none in the qualification. In the first place, we must regard the charge as asked as a mere abstraction; as a charge asked upon the supposition that the jury might find a state of facts to exist of which there is no evidence whatever in the record before us, and it purports to set out all the evidence in the case. The defendant offered no evidence to prove any such state of facts as the charge assumes the jury may find. The only evidence offered in the case by the defendant was the introduction of the deed from Ernst; also, a plat of the premises in ques-

tion and its surroundings, and evidence that Spring Garden was a suburban village. This and the testimony of a single witness, who was the road-master of the defendant, was all the evidence the defendant offered. This road-master would be as likely as any one to know how the water flowed. All he says on the subject is: "The water is turned back by the railroad upon plaintiffs' lot, and the dirt-pile prevents it from running upon the track and through the culvert in the track. This culvert is the company's property." The only witness for the plaintiff who speaks of the flow of water from Walker Mill road, merely says: "The water comes across from Walker Mill road *to the front* of plaintiffs' property, and is stopped and turned back." This witness does not say that the water runs *upon* the plaintiffs' property, but to the front of it, where it is stopped and turned back. In the next place, for all that appears in the charge asked, the defendant may itself have caused the water to flow in front of plaintiffs' lot by obstructions at the point where the Walker Mill road strikes the railroad track. And this view of the case may be inferred by the qualification of the charge given by the court, and is very probable, if not the fact, from the testimony. We think, therefore, the difference between the charge asked and the qualification of the court is, that the one assumed that the jury might find a state of facts to exist of which there was no evidence, and was consequently an abstraction, while the other was based upon evidence in the case. The sixth charge asked for by the counsel for defendant is as follows: "That the owners of lots in towns and cities are not bound to permit the flow of mere surface-water from adjoining lots over their lots, and that if there was no stream or water-course leading over plaintiffs' lot and into that of the defendant, that is, L'Hommedieu street, and that if the jury find that Spring Garden was, during the time covered by this action, a suburban town, adjoining the city of Cincinnati, the lots therein being generally small lots, occupied and used for business and private resi-

dences, the plaintiff can not recover." This charge the court refused to give, stating that "this applies to cases where the upper lots are so materially changed on the surface as to discharge the surface-water materially different upon the lower lots than naturally. If, substantially, in a state of nature, the rule is as I have stated." To the refusal and qualification the defendant excepted, and assigns the same for error. For the reasons already given, and the cases in 16 and 22 Ohio St., the court did not err in refusing the charge as asked, nor in the qualification. We may say that in Massachusetts the authorities are, that no action will be for the diversion of mere surface water, as distinguished from a water-course, either in the city or country, and that the doctrine of servitude as to surface-water is not recognized. See *Luther* v. *Westminster Co.*, 9 Cush. 171 ; *Gannon* v. *Hargadon*, 10 Allen, 106 ; *Flagg* v. *City of Worcester*, 13 Gray, 601 ; *Dickenson* v. *City of Worcester*, 7 Allen, 19.

The seventh special charge requested by defendant's counsel, was as follows : " That if the defendant has constructed a sewer between the rails of its track, for the drainage of its road-bed, it is not bound to permit water from adjacent lots to pass through such sewer;" which instruction the court refused to give as asked, but gave, with the following qualification, "unless it naturally flows there—that is, has not been made to flow from artificial sources." And to this refusal and qualification the defendant excepted, and assigns the same for error. Now, we must say as to this charge, that it is true, as a matter of fact, that the defendant was not bound to permit water from adjacent lots to pass through its sewer, for it had the right, so far as the plaintiff was concerned, to stop up its sewer, and let the water flow over its track, and thence find its way to Mill creek as best it could. It was immaterial to the plaintiff what the defendant did with the water after it got on its track, provided the defendant did not cause it to flow back over his (plaintiff's) premises. The question before the jury

was, not whether the defendant should permit the water to flow into its sewer, but whether it could lawfully prevent the water from flowing from plaintiff's lot. The charge asked, therefore, was immaterial, and the court did not err in refusing it as asked. The qualification of the charge by the court, if read literally, would be that the defendant *was* bound to permit the water to pass through its sewer, if it flowed there naturally; but it can hardly be claimed that this was its meaning, or that it was so understood by the jury: all that was meant was, that if the water flowed on the track naturally, that is, from the natural lay of the ground, and not artificially, the defendant had no right to prevent it from coming on the track by causing it to flow back on the plaintiff's ground. It being once on the track, the defendant might dispose of it according to its own convenience, either by permitting it to pass through the sewer, or otherwise, provided it did no damage to other persons. We find no error, therefore, in the qualification.

These seven special charges being thus disposed of by the court below, the court was next asked to give its general charge to the jury in writing, which the court complied with, and the defendant excepted to the third, fourth, and fifth subdivisions of said general charge, and assigns the same for error.

The *third* subdivision of the general charge merely announces the law of servitude as to surface drainage, as decided in Ohio, and which we have already considered. There is no error in this part of the charge.

The *fourth* subdivision of the general charge excepted to, is as follows :

"In this case, however, if you find that the railroad track, along the place in question, was conveyed to the defendant by Ernst, through his lands, according to the purport of the deed introduced by the defendant, that Ernst then owned the plaintiff's lands, who afterward bought the same from, or claim through him, then the defendant acquired the right, as against all Ernst's other lands there,

and against subsequent purchasers from him or through him, to make, use, operate, and maintain its railroad, and any change in the natural surface-flow of the water which would reasonably result therefrom, it acquired the right to make, because a necessary incident to, and natural consequence of, such grant. But I further charge you, in this connection, that the right to construct, maintain, use, and operate its railroad upon said strip, and for railroad purposes, with as many tracks as it might desire, under that deed, did not confer upon it, as against Ernst's or plaintiff's adjoining lands, the right to make any part of such eighty-foot strip a place of permanent deposit for stone brought there to be shipped by its road for itself, or for others for hire to be paid to it, if such stone-pile, or the *debris* deposited from it, either or both, would form an embankment, and interrupt the otherwise natural flow of the surface-water, and cause it to back and stand upon plaintiff's lands, to the injury thereof. The defendant was still bound to so use the property in all collateral and incidental respects, as not to injure the property of the plaintiffs; for it might well be that it could find other suitable places for such stone-pile, and that such pile, at this particular place, was in no manner essential to the proper and full use of the strip for all railroad purposes contemplated by it and Ernst, in and by such deed. And if you find, upon the evidence, that such stone-pile, at the place in question, is essential and indispensable to the full and proper purposes of such railroad, then the defendant has a right to maintain it there, though it may damage plaintiffs' premises by backing water upon the same; but the defendant should then keep the *debris* so removed as not to form an embankment so as to back the water to plaintiffs' injury."

We see no error in this part of the charge; it is as favorable to the defendant as could well be asked, under the law of servitude, as to surface drainage, as declared in this state. It merely states the law of ordinary care, under the circumstances, and of defendant's rights under this deed, and, as

we think, states it correctly. The rest of this part of the charge instructs the jury as to the length of time required to acquire a right by prescription in this state. About this there can be no dispute. The jury, under these instructions of the court, found for the plaintiffs, and a motion for a new trial being overruled, the defendants excepted. It is also assigned for error, that the court erred in overruling the motion for new trial, because the verdict is not sustained by the evidence. We think the verdict is fully sustained by the evidence, and find that the evidence is all one way, and fully justified the jury, under the law, as given by court, in coming to the conclusion they announced.

The judgment must therefore be affirmed.

Judgment affirmed.